**Barney O. BROWNE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 4–63 Civ. 195.**

United States District Court
D. Minnesota,
Fourth Division.

Aug. 21, 1964.

---

2. Sections 6312(a) (c) and 6213(c) relate to procedural prerequisites for assessment and have no application here.

Timothy J. Halloran, St. Paul, Minn. (Doherty, Rumble & Butler, St. Paul, Minn., of counsel), for plaintiff.

Louis F. Oberdorfer, Asst. Atty. Gen., C. Moxley Featherston, David A. Wilson, Jr., and A. H. La Force, II, Attys., Dept. of Justice, Washington, D. C., and Miles W. Lord, U. S. Atty., Minneapolis, Minn., for defendant.

NORDBYE, District Judge.

This action comes before the Court on a complaint filed by plaintiff against the United States in which he seeks to recover some $16,855.67, being the amount of the assessments or penalties allegedly assessed against him and paid under protest for the withholding taxes and social security taxes withheld from the employees of the Downtown Ford Company, of St. Paul, Minnesota, during the second and part of the third quarter of the year 1957.

It appears that the plaintiff was the sole stockholder, President, and General Manager of the Downtown Ford Company, a corporation, during the period involved here. The company was originally organized through the assistance of the Ford Motor Development Company. In the year 1955, Downtown made arrangements to borrow $118,000 from Universal CIT Credit Corporation, hereafter called CIT. Some $50,000 of this amount was used to pay Ford Motor Development Company, and the balance was used for the improvement of the building which it occupied. In obtaining this loan from CIT, Browne had to guarantee the loan, assign his stock, give a chattel mortgage, and promise to pay the amount borrowed at the rate of $3,000 a month. The loan was negotiated in October, 1955, and in 1956 financial troubles resulted so that Downtown had difficulty in maintaining the required payments to CIT.

One Mr. Frank was in charge of the St. Paul office of CIT, and apparently the business affairs of Downtown became so critical that in May, 1957, or thereabouts, he frequently came over to Downtown to aid and assist Browne and his employees in Downtown's business affairs. The evidence would indicate that Frank spent a great deal of time in trying to keep Downtown solvent. At or about this time, attempts were made by the Ford Company to sell the franchise, but no sale was made. The situation continued to worsen, and when Downtown could not pay all of its debts, according to Browne, Frank took it upon himself to determine

which bills should be paid and which should be deferred, and when it came to the payment of the taxes in question, Browne contends that Frank made the direction that the payment of these government taxes which had been collected from the employees as withholding and social security taxes should be deferred. The undeniable fact is that these trust funds were used in the payment of current expenses in the operation of Downtown's business.

It appears that the second quarter taxes for 1957 should have been deposited in the bank, according to government regulations, on May 15th, June 15th, and July 15, 1957. The portion of the third quarter taxes collected in July should have been deposited on August 15, 1957. However, none of these deposits were made, although a quarterly return was filed for the second quarter of 1957 on or about July 31st and for the third quarter of 1957 some time after October, 1957. It is the position of the plaintiff that, by reason of the economic power that CIT had over Downtown in view of the security that it held for its debt, he merely followed the dictates of Frank in failing to deposit and pay the government taxes, and his position is that he did not intentionally or voluntarily fail to pay the taxes, but that all directions with respect thereto were made by Frank and solely by him.

The evidence discloses that one Philip L. Pfeilsticker was the business manager of Downtown, and he frequently met with Browne and Frank during the various conferences that these men had together during the critical days of 1957. It seems apparent that when Browne testified in these proceedings he wanted to create the impression that he had little, if anything, to do with the business end of the company; that he was a salesman; and that he left the so-called money end of the business to Pfeilsticker. Pfeilsticker is in accord with the testimony of Browne in that he agrees that it was Frank who originally suggested that the payment of the government taxes be deferred, and that while Frank realized that they were taking a "calculated risk" in not paying these taxes, nevertheless it was his advice that this risk had to be taken. Although it is Pfeilsticker's position in his testimony that, in view of CIT's assigned power over the business, Downtown had no alternative but to go along with Frank's plan, he made it clear that Browne was not only active and well informed as to the financial end of the business, but also voluntarily and knowingly acquiesced in Frank's plan. In other words, the weight of the evidence is clear that Browne was not only a responsible officer of the corporation, but that he was its sole stockholder and the sole owner of Downtown, and that he knowingly and intentionally agreed with Frank's plan to take the "calculated risk."

It appears that on August 28, 1957, when Downtown had issued to CIT certain N.S.F. checks in payment of certain cars taken out of trust, which CIT also was financing, CIT took over and liquidated the business by selling the cars on hand, collecting the money which was due Downtown, and the business was closed, resulting in a substantial loss to CIT. Consequently, we are confronted with this situation: Browne paid the unpaid taxes under protest and now he seeks to recover them on the theory that it was Frank who made the decision not to pay the Government and that he, Browne, had no part in it.

Defendant's Exhibit B, which is a letter dated February 7, 1958, from Browne to the District Director of Internal Revenue, St. Paul, negatives the claim which Browne now makes as to the dominance of CIT with reference to the failure to pay to the Government the taxes which were withheld from the wages of the employees. The pertinent portion of this letter reads:

"Although it never actually did so, Universal CIT Credit Corporation had the power, by virtue of its possession of the irrevocable stock power and proxy, to remove the existing management of Downtown Ford Company at any time. CIT did direct the conduct of Downtown Ford

Company's business in increasing detail during the three months preceding the closing down of the business on August 28, 1957. During the latter half of that period CIT maintained its own representative in the Downtown Ford Company office and advised Downtown Ford Company which creditors it wanted paid but, although the implication from the directions given was plain, did not at any time specifically direct Downtown Ford Company to refrain from payment to the Government of taxes withheld from wages of employees."

The Court does not assume to minimize the influence which Frank may have exercised in directing the affairs of Downtown during this period and he may well have been the dominant influence in the promotion of a plan to delay the payment of the trust funds to the Government. But that Browne knowingly and intentionally aided and assisted him in the plan is convincingly established by all the evidence. Moreover, although CIT could have taken possession of all of the property of Downtown, and it could have sold out all of Downtown's assets, and it could have exercised its rights under the stock power it held, the admitted fact is that it did not attempt to do so prior to August 28, 1957. And, as the letter of February 7, 1958, stated, CIT "did not at any time specifically direct Downtown Ford Company to refrain from payment to the Government of taxes withheld from wages of employees." Browne remained as the sole owner and operator of the business throughout until August 28, 1957, and he should not be permitted, in light of a common sense construction of the evidence, to place the blame for the gross breach of trust exclusively on the shoulders of Frank, who is now deceased. The cases of Bloom v. United States, 272 F.2d 215 (9 Cir.), and United States v. Strebler, 313 F.2d 402 (8 Cir.), fully support the conclusions reached here, and the cases relied upon by plaintiff are distinguishable.

The only question that gives the Court any concern pertains to the trust funds collected from August 1 to August 28, 1957. It was on this latter date that CIT commandeered all the funds and assets of Downtown, and Browne no longer had any control over the funds of the corporation. Although it may be reasoned that the plan instituted by Frank and agreed to and aided by Browne was in full force and effect during the month of August, 1957, and if CIT had not taken over the business on August 28th, the "calculated risk" plan would have continued and the August tax collection would have been diverted as in the past, the undeniable fact is that when it became Downtown's obligation to deposit the August trust funds, Browne no longer had any control of Downtown's assets, and admittedly was in no position to make the deposit as the Government regulations required. The fact that ostensibly he was President of the defunct corporation and exercised some nominal acts as such after August 28, 1957, cannot charge him with the intentional and knowing failure to account for the August tax funds not paid to the Government. It is the Court's view, therefore, that the weight of the evidence fully requires a finding that the amount of the tax funds in question collected by Downtown up to August 1, 1957, and paid as penalties under protest by Browne, cannot be recovered in this proceeding. As to the amount of the penalties he paid under protest for the period from August 1, 1957, to August 28, 1957, he should have judgment therefor. Counsel may collaborate in order to compute the amount of recovery in view of the Court's conclusions in that regard.

Findings of fact and conclusions of law consistent herewith may be presented to the Court on ten days' notice. Exceptions are allowed.