Lester TAUBMAN, Plaintiff,

v.

UNITED STATES of America, Defendant
and Third Party Plaintiff,

v.

Murton M. SCHLESINGER, Third
Party Defendant.

UNITED STATES of America, Plaintiff,

v.

INTERCONTINENTAL INDUSTRIES,
INC., Defendant.

Civ. A. Nos. 4–72489, 5–71759.

United States District Court,
E. D. Michigan, S. D.

Jan. 12, 1978.

J. Laevin Weiner, Southfield, Mich., for Taubman.

D. Patrick Mullarkey, Tax Div., Dept. of Justice, Washington, D. C., James K. Robinson, U. S. Atty. by Pamela J. Thompson, Asst. U. S. Atty., Dept. of Justice, Detroit, Mich., for United States of America.

Murton Schlesinger, in pro per.

Dean Carlton, Dallas, Tex., for Intercontinental Industries, Inc.

## OPINION

FEIKENS, District Judge.

These combined actions have been brought to determine if Lester Taubman and Murton Schlesinger, former president and vice–president respectively of the now–bankrupt corporation, Prebuilt Homes, Inc., can be held personally liable under § 6672 of the Internal Revenue Code for the failure of Prebuilt Homes to pay over to the government income and social security taxes withheld from its employees from August, 1969 until February, 1970, when the company finally ceased operations. Both Taubman and Schlesinger were assessed $156,565.34, the full amount claimed by the government as owing in withholding taxes from Prebuilt. Taubman paid $300 on his assessment and filed this complaint to recover it. The United States counterclaimed for the balance of the assessment and joined Schlesinger as a third party defendant. The government alleges that both Taubman and Schlesinger are liable under § 6672 as responsible and controlling corporate officers who wilfully failed to collect and pay over federal payroll taxes for the corporation's employees. Consolidated with this action is another action by the government, brought under § 3505(b) of the Internal Revenue Code against Intercontinental Industries, Inc. (INI), Prebuilt's principal source of financing during the period in question. The government alleges that from August, 1969 to February, 1970, INI loaned $253,897.79 to Prebuilt specifically for the payment of salaries and wages knowing that no federal payroll taxes were being collected or withheld on them. If this is proven, then under § 3505(b), INI would be liable for 25% of this amount, or $63,-474.45.

All claims were tried to the court. The record consists of the affidavits of the principal parties, depositions, a number of documentary exhibits, and the testimony of Robert Campbell, an IRS agent who reviewed and analyzed Prebuilt's financial records. Post–trial briefs have been submitted, and the court now makes findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.

### I.

Prebuilt Homes, Inc. was formed in April, 1969 by Paul Corp and Lester Taubman for the purpose of constructing pre–fabricated homes and installing them on building sites.[1] Prebuilt's homes were to be built by a unique modular construction process, which Paul Corp had originated several years earlier, as president of his own home construction company, Peerless Manufacturing Corporation. When Peerless went bankrupt in March, 1969, Corp interested Taubman in his modular home design. Taubman redrafted the design, entered it in a contest sponsored by the Metropolitan Detroit Citizens Development Authority (MDCDA), won the contest, and was awarded a contract to build some 800 modular housing units at a total price of $12,000,000. Prebuilt Homes, Inc. was formed shortly thereafter.

Taubman supplied the initial capital, and Corp supplied the technical expertise. Corp was made chairman of the board, and Taubman was president. Initially, each owned a 50% interest in Prebuilt, but shortly after incorporation, Murton Schlesinger, who had formerly worked as an officer of Peerless Manufacturing under Corp, was made vice–president–treasurer and given a 5% interest.

---

1. This recitation of uncontested facts is taken from the Final Joint Pretrial Statement, pp. 1–6.

It was apparent from the outset that Prebuilt would require large amounts of capital to operate and produce the houses under contract with the MDCDA. To obtain this needed capital, Prebuilt, following extensive negotiations, entered into a financing agreement with Intercontinental Industries, Inc. of Dallas, Texas, a holding company with an interest in a number of diversified businesses. The agreement, dated May 16, 1969, provided that 81% of Prebuilt's issued and outstanding stock would be transferred to INI in exchange for stock of INI listed on the American Stock Exchange; this was the first major step in a process which would eventually have made Prebuilt a wholly–owned subsidiary of INI. In return, INI committed itself to obtain all of the operating funds needed by Prebuilt not otherwise obtainable, not to exceed $6,000,000.

INI began at once to fund Prebuilt's operating expenses. To implement their financing arrangement, a procedure was established under which the accounting department of Prebuilt would, on a weekly basis, determine the amount of operating funds needed for the following week which could not be obtained from other sources. These needs would be communicated to INI by telephone or in writing. INI would then transfer the requested funds to Prebuilt's general account at the City National Bank in Detroit and would subsequently receive back daily expense reports from Prebuilt verifying that the funds had been used for the purposes requested. Under this arrangement, a total of $948,000 was transferred to Prebuilt during 1969 and 1970.[2] In further satisfaction of its financing obligations under the May 16, 1969 agreement, INI also arranged two loans of $350,000 each from the City National Bank of Detroit to Prebuilt in May and October of 1969. INI supplied collateral for these loans totaling $1,485,500.

The business relationship between Prebuilt and INI was in jeopardy almost from the beginning. Shortly after their agreement was signed, S. Mort Zimmerman, president of INI, issued a misleading announcement to the financial community regarding Prebuilt's future earning potential. The announcement indicated that Prebuilt had obtained $130,000,000 in firm housing construction contracts, whereas in fact the company had only received bid solicitations and indications of interest in this amount. Immediately, the price of INI's stock on the American Stock Exchange soared. Trading in INI's stock was suspended pending an investigation, and on August 9, 1969, following a hearing, INI's stock was "delisted" from the American Stock Exchange. This development prevented INI from fulfilling all of its obligations to Prebuilt under their May 16, 1969 agreement.

At about this same time, Prebuilt was informed by the Federal Housing Administration that none of Prebuilt's home construction loans would be guaranteed by the FHA as long as Prebuilt was associated with INI. FHA's position may have been prompted by reports that one of INI's subsidiaries, Valley Die Cast Corporation of Detroit, had connections with organized crime. FHA approval was required on all homes to be built under Prebuilt's contract with MDCDA.

These developments made it clear to the officers of both Prebuilt and INI that the two companies would have to disassociate, and thus in early August, 1969, a concerted effort was begun to find a successor to INI to assume Prebuilt's capitalizing responsibilities.

Though it was no longer possible for Prebuilt to become a subsidiary of INI under their May 16, 1969 agreement, INI continued to treat Prebuilt as a subsidiary and to finance Prebuilt's operations with regular transfers of funds. Subsequent to August 9, 1969, INI lent over $488,000 to Prebuilt for operating expenses,[3] a substantial proportion of which was used for payroll. Moreover, the record reflects a close, continuing contact between INI and Prebuilt during the latter half of 1969, which includ-

---

2. See Government's Exhibit # 7.

3. See Government's Exhibit # 7.

ed almost daily telephone correspondence between officers of the two companies.[4]

The parties were unsuccessful in finding a new buyer for Prebuilt Homes, and the company's operations gradually declined and finally ceased altogether in January, 1970. Prebuilt had been able to manufacture and install only a small number of its modular housing units under its contract with MDCDA. A petition in bankruptcy was filed in May, 1970.

From August 15, 1969 until March, 1970 when the company went out of business, Prebuilt failed to pay over to the government any federal income or social security taxes for its employees, as required by §§ 3102(a), 3402(a), and 7501(a) of the Internal Revenue Code. At the time it went bankrupt, Prebuilt had an unpaid tax liability of $55,393.65 for the third quarter of 1969, $97,069.45 for the fourth quarter of 1969, and $17,457.83 for the first quarter of 1970, for a total of $169,920.93, including penalties and interest. The IRS assessed Corp, Taubman, and Schlesinger for this liability under § 6672 of the Internal Revenue Code. Corp has since died, leaving no assets, and thus his liability is not involved in this proceeding. No formal assessment was made prior to the government's action against INI for its alleged liability under § 3505(b).

## II.

■ Section 6672 of the Internal Revenue Code provides:

§ 6672. Failure to collect and pay over tax, or attempt to evade or defeat tax

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat

any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. No penalty shall be imposed under section 6653 for any offense to which this section is applicable.

Two conditions must be met before an individual can be held liable under this provision: (1) he must be responsible for the collection and payment of withholding taxes, and (2) he must wilfully fail to collect and pay them over. *Teel v. United States,* 529 F.2d 903, 905 (9th Cir. 1976); *Pacific National Ins. v. United States,* 422 F.2d 29 (9th Cir. 1976). Responsibility for the collection and payment of withholding taxes under § 6672 can attach to high corporate officers,[5] but this is not automatic. The test for responsibility of a corporate officer under § 6672 is a functional one, which focuses upon the degree of control and influence which the officer exercised over the financial affairs of the corporation and, more specifically, over the disbursement of funds and priority of payments to creditors.

Corporate office does not *per se,* impose the duty to collect, account for and pay over the withheld taxes. On the other hand, an officer may have such a duty even though he is not the disbursing officer. *Cf. Bloom v. United States,* 272 F.2d 215 (9th Cir. 1959), *certiorari denied,* 363 U.S. 803, 80 S.Ct. 1236, 4 L.Ed.2d 1146. . . .

Liability attaches to those with power and responsibility within the corporate structure for seeing that the taxes withheld from various sources are remitted to the Government. *Scott v. United States,* 354 F.2d 292, 296, 173 Ct.Cl. 650 (1965); see also *Gefen v. United States,* 400 F.2d 476, 482 (5th Cir. 1968), *certiorari denied,* 393 U.S. 1119, 89 S.Ct. 990, 22 L.Ed.2d

---

**4.** Wicks Deposition, pp. 13, 21, 35; Taubman Dep. # 1, p. 26; Taubman Dep. # 2, p. 12; Schlesinger Dep. # 2, pp. 15, 39.

**5.** § 6671. Rules for application of assessable penalties

＊　＊　＊　＊　＊　＊

(b) Person defined.–The term "person", as used in this subchapter, includes an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs.

123. This duty is generally found in high corporate officials charged with general control over corporate business affairs who participate in decisions concerning payment of creditors and disbursal of funds. *Monday v. United States*, 421 F.2d 1210, 1214–1215 (7th Cir. 1970); *Braden v. United States*, 442 F.2d 342 (6th Cir. 1971). Under this test, the court finds that both Taubman and Schlesinger were responsible persons for purposes of § 6672.

■ Taubman was the president and co-founder of Prebuilt and one of its principal owners.[6] He had authority to sign checks for the corporation and he frequently signed payroll checks.[7] He was one of the corporation's officers involved on a daily basis with the payment of bills and the management of creditor problems.[8] Taubman received daily summaries of cash receipts and disbursements and monthly financial reports from Prebuilt's bookkeeper, Gerald Wicks.[9] Most important, Taubman participated in regular meetings with Corp and Schlesinger to determine creditor priorities and took a predominant role in these matters.[10] The picture that emerges is one of a high corporate officer who was intimately familiar with and exercised substantial control over the day–to–day financial affairs of the corporation. Taubman's status as a responsible corporate officer under § 6672 is clear.

■ Schlesinger was the vice–president and treasurer of Prebuilt and eventually held a substantial ownership interest in the corporation as well.[11] He, too, had check–signing authority, and like Taubman, his signature appears on the majority of Prebuilt's payroll checks.[12] During this period in question, he actively participated in efforts to obtain additional financing for Prebuilt.[13] Schlesinger also participated in regular meetings with Corp and Taubman to determine creditor preferences.[14]

Despite these indicia of financial responsibility, Schlesinger contests his status as a responsible corporate officer under § 6672. Emphasizing his role as a minority shareholder and lesser officer of the corporation, he argues that he was at all times subordinate to Corp and Taubman and served at their pleasure. Schlesinger also points out that check–signing authority was vested in all three officers and that under City National's banking requirements, no corporate check was valid without at least two of their signatures.[15] Thus, Schlesinger argues that he was unable to individually sign checks to pay the withholding taxes, yet Corp and Taubman could sign checks to preferred creditors without his participation or acquiescence. Relying upon a number of cases which have defined a responsible person under § 6672 as one who possesses the

6. As a general proposition it may be safely postulated that one who is the founder, chief stockholder, president, and member of the board of directors of a corporation (such as the plaintiff) is rebuttably presumed to be the person responsible under section 2707 of the Code and is thus liable for the penalty, in the absence of an affirmative showing by him that in actual fact he lacked the ultimate authority to withhold and pay the employment taxes in question, or that his omission was not willful in the statutory sense.
*McCarthy v. United States*, 437 F.2d 961, 967–968 (Ct.Cl.1971).

7. Taubman Dep. # 1, pp. 48, 71; Taubman Dep. # 2, p. 27; Wicks Dep., p. 17.

8. Taubman Dep. # 1, p. 61; Schlesinger Dep. # 1, pp. 53–54; Wicks Dep., pp. 4, 30–31.

9. Taubman Dep. # 1, p. 30; Wicks Dep., pp. 5, 39, 47.

10. Taubman Dep. # 1, pp. 43, 45, 61; Taubman Dep. # 2, pp. 26–27; Schlesinger Dep. # 1, pp. 29–31; Schlesinger Dep. # 2, p. 6; Wicks Dep., pp. 30, 43, 54.

11. Though Schlesinger's initial ownership interest in the corporation was only 5%, he requested and was allowed to increase his share to 21% during a reorganization of Prebuilt in October of 1969.

12. Wicks Dep., pp. 17–18.

13. Taubman Dep. # 1, p. 17; Wicks Dep., p. 4; Zimmerman Dep., p. 12.

14. Schlesinger Dep. # 1, pp. 29–30; Schlesinger Dep. # 2, p. 6; Wicks Dep., pp. 42, 54.

15. Wicks Dep., p. 19.

"final word" as to which creditors should be paid and when, *Wilson v. United States,* 250 F.2d 312, 316 (9th Cir. 1957); *Hewitt v. United States,* 377 F.2d 921, 924 (5th Cir. 1967); *Carter Est., et al. v. Comm.,* 62–1 U.S.T.C. 9196; 22 A.L.R.3d 8, 50, Schlesinger contends that his lack of absolute control over Prebuilt's finances precludes a finding of responsibility in his case.

The court cannot accept this argument. The decisions regarding creditor preferences and disbursement of funds were, in this corporation, collective decisions, arrived at in regular, almost daily meetings of the executive staff. Schlesinger participated in these meetings with Corp and Taubman and participated in this collective decision–making process as well; he did in fact sign corporate checks or authorize his signature to be placed on corporate checks.[16] The fact that Schlesinger had to share check–signing authority with other corporate officers in no way minimizes his authority for purposes of § 6672. As explained by the United States Court of Appeals for the Fifth Circuit, addressing a similar argument in *Brown v. United States,* 464 F.2d 590, 591 (5th Cir. 1972):

> Were we to hold . . . that lack of individual authority to sign corporate checks insulated Brown from liability . . . we would surely open the door to protective co–signing arrangements. The effect of such a holding would tend to emasculate § 6672.

See also *Garnet v. United States,* 385 F.Supp. 665, 668 (E.D.Ky.1974).

The fact that other officers in the corporation may be responsible persons under § 6672 does not preclude a finding that Schlesinger is responsible as well. *Braden v. United States, supra* at 343; *Fitzgerald v. United States,* 407 F.Supp. 1132, 1137 (E.D.Ky.1976); *Monday v. United States, supra* at 1214; *Harrington v. United States,* 504 F.2d 1306, 1312 (1st Cir. 1974). Though responsibility under § 6672 does require the "final word" over corporate finances, "[i]n this context, 'final' means significant, rather than exclusive control." *Turner v. Unit-*

ed States, 423 F.2d 448, 449 (9th Cir. 1970); *Dudley v. United States,* 428 F.2d 1196, 1201 (9th Cir. 1970). Though Schlesinger's involvement in the financial affairs of the corporation was not as great as Taubman's, there is nevertheless ample evidence in the record to establish his status as a responsible person for purposes of § 6672.

The test for wilfulness under § 6672 was stated and discussed in *Monday v. United States, supra* at 1215–1216:

> The precise content to be given the concept of "willfulness" varies according to the legal context in which it appears. In criminal statutes, "willfulness" generally requires bad purpose or the absence of any justifiable excuse. *United States v. Murdock,* 290 U.S. 389, 394, 54 S.Ct. 223, 78 L.Ed. 381. In civil actions, however, these elements need not be present. Rather, willful conduct denotes intentional, knowing and voluntary acts. It may also indicate a reckless disregard for obvious or known risks.

> Despite its denomination as a "penalty" assessment, the statutory liability imposed by Section 6672 is essentially civil in nature. *Cash v. Campbell,* 346 F.2d 670, 673 (5th Cir. 1965). Its basic purpose is the protection of governmental revenue. *Botta v. Scanlon,* 314 F.2d 392, 393 (2d Cir. 1963); *Spivak v. United States,* 370 F.2d 612, 616 (2d Cir. 1967), *certiorari denied,* 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625. It provides a remedy to prevent the unnecessary loss of tax funds by permitting the "taxing authority to reach those responsible for the corporation's failure to pay the taxes which are owing." *United States v. Graham,* 309 F.2d 210, 212 (9th Cir. 1962); *White v. United States,* 372 F.2d 513, 516, 178 Ct.Cl. 765 (1967). In light of this purpose, we agree with those courts which have defined willful action under Section 6672 as referring to voluntary, conscious and intentional–as opposed to accidental–decisions not to remit funds properly withheld to the Government. *Spivak v.*

---

**16.** Wicks Dep., p. 19.

*United States,* 370 F.2d 612, 615 (2d Cir. 1967), *certiorari denied,* 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625; *Cross v. United States,* 311 F.2d 90, 94 (4th Cir. 1962); *Hewitt v. United States,* 377 F.2d 921, 924, 22 A.L.R.3d 1 (5th Cir. 1967); *Flan v. United States,* 326 F.2d 356, 358 (7th Cir. 1964); *Bloom v. United States,* 272 F.2d 215, 223 (9th Cir. 1959); *certiorari denied,* 363 U.S. 803, 80 S.Ct. 1236, 4 L.Ed.2d 1146; *Scott v. United States,* 354 F.2d 292, 295, 173 Ct.Cl. 650 (1965). Liability does not depend upon the presence of bad motive or the specific intent to defraud the Government or deprive it of revenue. *White v. United States,* 372 F.2d 513, 521, 178 Ct.Cl. 765 (1967). This definition of wilfulness is well established by the United States Court of Appeals for the Sixth Circuit. *Braden v. United States, supra* at 344; *Slodov v. United States,* 552 F.2d 159, 164 (6th Cir. 1977).

▮ There is really no question that Taubman and Schlesinger were both well aware that federal withholding taxes were not being collected and set aside for payment to the federal government after August 9, 1969.[17] Both were aware that funds were being deposited in Prebuilt's payroll account which were insufficient to cover both employee wages and taxes and that only employee wages were being paid out of this account.[18] Both were aware too, that other creditors of the corporation were being paid during this period and indeed, as noted above, both participated in the decisions to prefer these other creditors over the federal government.[19] This evidence would appear to conclusively establish wilfulness on the part of both of these corporate officers.

Taubman and Schlesinger contend, however, that their decision not to collect and

pay over withholding taxes subsequent to August 9, 1969 was not wilful, but instead was forced upon them by officers of INI, who refused after that date to loan them funds sufficient to pay withholding taxes and would only fund their payroll needs on a "net payroll" basis. They emphasize that INI during this period was Prebuilt's primary means of financial support; Prebuilt was not generating any revenue of its own, and no other means of obtaining sufficient working capital was available. As a result, Taubman and Schlesinger contend that from August, 1969 until the demise of the corporation in March, 1970, INI exercised overriding control of Prebuilt, dictating and monitoring the actual disbursement of loaned funds on a daily basis and depriving Prebuilt's officers of virtually all authority over Prebuilt's financial affairs. Under these circumstances, Taubman and Schlesinger contend that INI was the party primarily responsible for the failure to collect and pay over federal withholding taxes and that their own limited role in this failure does not establish wilfulness under § 6672.

This defense is rejected. Factually, the court has no disagreement with the contention that after August 9, 1969 further transfers of INI funds to Prebuilt were conditioned upon INI's control over the allocation and disbursement of those funds[20] and that INI directed Prebuilt's officers not to allocate any loaned funds to withholding taxes.[21] Legally, however, this circumstance does not absolve Prebuilt's officers of their responsibility for the financial affairs of the corporation and does not preclude a finding that Taubman and Schlesinger wilfully failed to collect and account for federal withholding taxes.

Whatever the terms or conditions of the financing arrangement between Prebuilt

---

**17.** Taubman Dep. # 1, pp. 29, 58; Taubman Dep. # 2, p. 8; Schlesinger Dep. # 1, pp. 10, 44; Wicks Dep., pp. 23, 41.

**18.** Taubman Dep. # 1, p. 29; Schlesinger Dep. # 1, p. 32; Wicks Dep., pp. 23, 41.

**19.** Taubman Dep. # 1, p. 61; Taubman Dep. # 2, p. 19; Schlesinger Dep. # 1, pp. 29, 43; Wicks Dep., p. 22.

**20.** Schlesinger Dep. # 1, p. 40; Schlesinger Dep. # 2, p. 11; Wicks Dep., pp. 7–8.

**21.** Schlesinger Dep. # 1, pp. 10–11, 35–37; Schlesinger Dep. # 2, p. 30; Wicks Dep., pp. 12–13, 23.

and INI subsequent to August 9, 1969, the officers of Prebuilt remained in legal control of the corporation and retained the power to make actual cash disbursements to payroll. Thus, and quite clearly, they also retained the legal responsibility for the collection and payment of federal payroll taxes for Prebuilt's employees. If INI was permitted to dictate creditor priorities to Prebuilt and allowed to fund only Prebuilt's net payroll requirements, it was only because Prebuilt's officers freely acquiesced in the arrangement, to serve their own self-interest in maintaining Prebuilt as a going concern. No defense to a finding of wilfulness under § 6672 is made out on these facts.

This same argument was raised and rejected in *Kalb v. United States*, 505 F.2d 506 (2d Cir. 1974), an action against corporate officers under § 6672 which involved an even more egregious case of creditor overreaching. There, a corporation known as Herold Radio experienced financial difficulties which caused its principal source of financing, Bankers Trust Co., to threaten termination of further credit unless a representative of the Trust Company was appointed to direct and oversee Herold Radio. Thereafter, until the corporation finally went bankrupt, the Trust Company representative exercised his superseding authority to pay only the corporation's most persistent creditors and refused to collect and pay over employee withholding taxes. A suit was subsequently brought against the officers of Herold Radio under § 6672. Their defense was lack of wilfulness:

> Appellants claims that they were not "responsible persons" and did not willfully fail to pay taxes within the meaning of section 6672.
>
> . . . [T]hey claim that during the relevant period Bankers Trust Company controlled Herold Radio's finances and prevented appellants from paying withholding taxes. They allege that they always included taxes in the list of debts for-

warded to the bank for approval of payment, but that the bank refused to approve payment. The government contests the allegation, but even if it were true it would not absolve appellants because it is undisputed that appellants voluntarily entered into and at all times acceded to the arrangement.

> Appellants concede that any power the bank may have had to select which creditors should be paid was granted by appellants as part of the consideration for the bank's continuing financing of Herold Radio. Appellants maintained legal control of the company, including the power to sign checks. Appellants were always free to rescind the agreement if it involved them in breaches of their duties under section 3402(a).

*Kalb v. United States, supra* at 510.

The court went on to explain its decision in terms of the trust obligation which § 6672 imposes upon responsible corporate officers:

> To permit corporate officers to escape liability under section 6672 by entering into agreements which prefer other creditors to the government would defeat the entire purpose of the statute. As we have noted, and as section 7501(a) makes explicit, withholding taxes are held in trust. We cannot imagine that in any other context a trustee could avoid his obligations by entering into an agreement by which funds entrusted to him are used to pay his other obligations. Similarly, we will not permit appellants so to escape their obligations here. *Cf. United States v. Hill*, 368 F.2d 617, 620–622 (5th Cir. 1966); *United States v. Strebler*, 313 F.2d 402, 404 (8th Cir. 1963); *Bloom v. United States*, 272 F.2d 215, 222–223 (9th Cir. 1959), *cert. denied*, 363 U.S. 803, 80 S.Ct. 1236, 4 L.Ed.2d 1146 (1960).

*Kalb v. United States, supra* at 510. See also *Browne v. United States*, 234 F.Supp. 19, 22 (D.Minn.1964).[22]

---

**22.** Browne was the president and sole stockholder of a car dealership, the Downtown Ford Company, who resisted liability under § 6672 for Downtown's failure to pay federal payroll taxes on the ground that he was pressured into avoiding these tax payments by one Frank, a representative of his principal creditor. The court did not accept this defense:

■ The facts of this case compel a similar result. Prebuilt's officers were not forced or coerced by INI into paying other creditors ahead of the federal government, for their financial relationship with INI was at all times a purely voluntary one. Boiled down to its essence, their argument is simply that, under the circumstances, Prebuilt's obligations for withholding taxes had to be ignored or the company would have faced immediate insolvency. Mere concern for the financial well–being of the corporation, however, does not excuse the failure to pay withholding taxes, and is not a defense to a finding of wilfulness under § 6672. *Monday v. United States, supra* at 1216; *United States v. Hill,* 368 F.2d 617, 621 (5th Cir. 1966). ("The desire to continue in business is not justification for violating the trust imposed by law to pay taxes."); *Scherer v. United States,* 228 F.Supp. 168 (D.C.Idaho 1964); *High v. United States,* 506 F.2d 755 (5th Cir. 1975); *Werner v. United States,* 374 F.Supp. 558 (D.C. Conn.1974), aff'd 512 F.2d 1381. Indeed, § 6672 was intended to prevent misappropriation of withholding tax funds for this very reason. *Mueller v. Nixon,* 470 F.2d 1348, 1351 (6th Cir. 1972); *Hartman v. United States,* 538 F.2d 1336, 1340 (8th Cir. 1976).

■ Taubman raises the further argument that he did not become aware of Prebuilt's failure to collect withholding taxes until at least October or November, 1969 and therefore cannot be held liable for any taxes due and owing but unpaid prior to that time. This argument must also be rejected. Recently, in *Slodov v. United*

> The Court does not assume to minimize the influence which Frank may have exercised in directing the affairs of Downtown during this period and he may well have been the dominant influence in the promotion of a plan to delay the payment of the trust funds to the Government. But that Browne knowingly and intentionally aided and assisted him in the plan is convincingly established by all the evidence.
>
> \* \* \* \* \* \*
>
> Browne remained as the sole owner and operator of the business throughout until August 28, 1957, and he should not be permit-

*States, supra* at 163–165, the United States Court of Appeals for the Sixth Circuit ruled that a corporate officer could be held liable under § 6672 for withholding tax obligations incurred by the corporation prior to his succession to responsible corporate office, because he thereafter learned of these tax obligations and nevertheless used corporate funds to prefer other creditors. The decision must control in this case, for it is undisputed that Taubman—who was a responsible corporate officer at all relevant times—learned at least by some point during late 1969 that Prebuilt's withholding taxes were not being paid,[23] and he nevertheless continued to authorize payments to other creditors.

■ Where an assessment has been made by the IRS against an individual under § 6672, as in this case, the burden rests upon the individual in any subsequent action to show that the assessment was erroneous. *Psaty v. United States,* 442 F.2d 1154, 1158–1161 (3rd Cir. 1971); *Lesser v. United States,* 368 F.2d 306, 310 (2d Cir. 1966); *United States v. De Beradinis,* 395 F.Supp. 944, 950 (D.C.Conn.1975); *Werner v. United States, supra* at 560–561. Both Schlesinger and Taubman have failed to sustain their burden here, and accordingly, both will be held liable for the full amount of Prebuilt's unpaid withholding tax liability; the stipulated figure is $156,565.34 plus statutory interest.

### III.

■ Section 3505(b) of the Internal Revenue Code provides:

> ted, in light of a common sense construction of the evidence, to place the blame for the gross breach of trust exclusively on the shoulders of Frank ....
>
> *Browne v. United States,* 234 F.Supp. 19, 22 (D.Minn.1964). The opposite result was reached on this same issue in *McCullough v. United States,* 462 F.2d 588, 590 (5th Cir. 1972); the court respectfully declines to follow this authority.

**23.** Taubman Dep. # 1, pp. 30, 58, 62; Taubman Dep. # 2, p. 8; Schlesinger Dep. # 1, p. 30; Wicks Dep., pp. 43, 54.

(b) Personal liability where funds are supplied.–If a lender, surety, or other person supplies funds to or for the account of an employer for the specific purpose of paying wages of the employees of such employer, with actual notice or knowledge within the meaning of section 6323(i)(1) that such employer does not intend to or will not be able to make timely payment or deposit of the amounts of tax required by this subtitle to be deducted and withheld by such employer from such wages, such lender, surety, or other person shall be liable in his own person and estate to the United States in a sum equal to the taxes (together with interest) which are not paid over to the United States by such employer with respect to such wages. However, the liability of such lender, surety, or other person shall be limited to an amount equal to 25 percent of the amount so supplied to or for the account of such employer for such purpose.

Two requirements must be met before a lender can be held liable under this provision: (1) the lender must advance funds to an employer for the specific purpose of paying wages, and (2) the lender must know that the employer does not intend to collect and pay to the government any withholding taxes on them. *United States v. Park Cities Bank & Trust Co.*, 481 F.2d 738, 739 (5th Cir. 1973); *Abrams v. United States*, 333 F.Supp. 1134, 1147 (S.D.Va.1971). The lender's knowledge under § 6323(i)(1) may

be either actual or constructive [24] and can be inferred where, for example, the lender knows of the employer's deteriorating financial condition. *United States v. Algernon–Blair, Inc.*, 441 F.2d 1379 (5th Cir. 1971); *United States v. Park Cities Bank & Trust Co., supra* at 740; *United States v. Wilmar General Contractors, Inc.*, 25 A.F.T. R.2d 70–1306 (N.D.Tex.1970).

As noted above, there is ample evidence in the record of this case to indicate that INI not only knew of Prebuilt's decision not to pay withholding taxes subsequent to August 9, 1969 but actually made that decision for Prebuilt, as a condition of further financing.[25] The motive behind INI's position appears to have been twofold: INI did not want to invest any more money in a concern which it knew could no longer become an INI subsidiary,[26] and INI was experiencing financial difficulties and cash flow problems of its own during this period.[27] For these reasons, INI, through its president, S. Mort Zimmerman, and its vice–president, Anon Denur, informed Prebuilt's officers that subsequent to August 9, 1969, INI would continue to finance only those expenses which were absolutely necessary to maintain Prebuilt as a going concern, until a successor to INI could be found, and this meant that payroll needs would only be financed on a net payroll basis.[28]

The only real issue regarding INI's liability under § 3505(b) is the amount of INI funds actually loaned to Prebuilt for

---

**24.** § 6323

(i) Special rules.–

(1) Actual notice or knowledge.–For purposes of this subchapter, an organization shall be deemed for purposes of a particular transaction to have actual notice or knowledge of any fact from the time such fact is brought to the attention of the individual conducting such transaction, and in any event from the time such fact would have been brought to such individual's attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routine. Due diligence does not require an individual acting for the organization to communicate in-

formation unless such communication is part of his regular duties or unless he has reason to know of the transaction and that the transaction would be materially affected by the information.

**25.** Schlesinger Dep. # 2, p. 11; Wicks Dep., pp. 12, 15–16, 40.

**26.** Schlesinger Dep. # 1, p. 14; Schlesinger Dep. # 2, p. 6; Zimmerman Dep., p. 31.

**27.** Schlesinger Dep. # 1, pp. 8–9, 15; Schlesinger Dep. # 2, p. 42; Wicks Dep., pp. 15–16.

**28.** Schlesinger Dep. # 1, pp. 12–13, 35–37; Schlesinger Dep. # 2, p. 11; Wicks Dep., pp. 13, 23, 31, 32.

the purpose of meeting payroll expenses. Under § 3505(b), INI's liability is limited to 25% of this amount. The issue arises from the informal manner in which loaned funds were requested and received by Prebuilt from August, 1969 until February, 1970, and from the incomplete state of Prebuilt's and INI's financial records. According to the deposition testimony of various witnesses, Prebuilt's weekly requests for operating expense funds ordinarily included a specific request for payroll funds,[29] Prebuilt's largest single expense item. However, most of these requests were communicated to INI by telephone, and virtually all itemized written records which may have been kept by either company have since been lost or destroyed. Moreover, all funds received by Prebuilt from INI were first deposited in Prebuilt's general bank account at the City National Bank of Detroit and there co–mingled with other funds which Prebuilt received from other sources. Prebuilt's payroll account was then funded out of this general account,[30] making it difficult to directly and specifically attribute any payroll funds to any outside sources.

Recognizing these difficulties, the government nevertheless attempted at trial to trace certain funds deposited in Prebuilt's payroll account to INI loans. The government's approach was essentially to correlate certain INI funds deposited in the general account with funds subsequently withdrawn from the general account and deposited in the payroll account. To the extent that these deposits and withdrawals were similar in amount and related chronologically, the government argued that they represented INI funds which had been loaned for the specific purpose of paying wages. Thus, for example, Prebuilt's accounts' payable journal[31] records a loan from INI of $35,000 on August 11, 1969. For that same day, Prebuilt's bank account statements[32] show a deposit of $35,000 to the general account, withdrawals of $17,-503.43 from the general account in several checks of unspecified amounts, and deposits of $5,000 and $10,000 to the payroll account. In this instance, the government contended that the $15,000 in deposits to the payroll account were attributable to the $35,000 loan from INI. Using the same methodology, Agent Robert Campbell, the government's expert, reviewed Prebuilt's account records for August, 1969 through January, 1970 and concluded that a total of $253,-897.79, deposited to the payroll account in 13 separate deposits during this period, were attributable to INI.

The government's methodology and results are disputed by INI on several grounds. The government's attempt to correlate INI loan deposits in the general account with transfers of funds from the general to the payroll account is said to be arbitrary and in some cases inaccurate, since other deposits to Prebuilt's general account from other sources often correlate equally well with these transfers. Also, and more fundamentally, INI emphasizes that funds were deposited to the general account from many sources, not merely INI, during this period, and were freely and completely co–mingled in the general account once deposited, thereby losing all identity as to source. On this basis, INI contends that the government's attempt to trace INI moniès through this account—merely on the basis of deposit and withdrawal chronology–is specious. As counsel for INI argues:

> Prebuilt needed general operating funds and this is what it got from INI and these funds were co–mingled with the other receipts of Prebuilt.... All went into the pot for the demands of the general operation of Prebuilt including wages .... [T]here is absolutely no evidence to show the specific purpose for which the specific funds from INI were requested or submitted.

Memorandum of Intercontinental Industries, Inc., p. 4.

29. Wicks Dep., p. 33; Zimmerman Dep. p. 19.

30. Schlesinger Dep. # 2, p. 14; Government's Ex. # 1.

31. See Government's Ex. # 7.

32. See Government's Ex. # 1.

The court disagrees. Though incomplete, the financial records and bank statements of Prebuilt do provide an adequate basis for the tracing of at least ten payroll deposits to INI loans during the period from August, 1969 to December, 1970. As to four of these payroll deposits, totalling $72,805.03,[33] the government's tracing analysis is virtually conclusive, since INI loans were deposited in the general account at a time when that account was overdrawn, and transfers to the payroll account were made immediately thereafter. Clearly, the source of theses payroll funds could only have been INI; no co–mingling of INI funds with other funds was involved. The proofs are equally conclusive as to one other payroll deposit of $15,000,[34] where Prebuilt's records indicate that an INI loan of this amount was deposited directly to the payroll account.

As to five other payroll deposits, totalling $87,227.07,[35] the records reflect that INI funds were deposited to the general account at a time when that account contained funds from other sources and transfers were then made to the payroll account the same day. The court finds that all five of these payroll deposits must also be attributed to INI. It appears from the record that during and after August, 1969, Prebuilt was usually paying out funds as quickly as they were being received.[36] Prebuilt frequently experienced "book overdrafts" to the general account during this period, and was forced, on occasion, to hold payroll checks until sufficient funds were deposited in the general account for transfer to payroll.[37] As Schlesinger testified, "money never sat around and got old." [37A] Indeed, in the case of at least four of these five payroll deposits, there were insufficient funds in the general account prior to the INI deposit to cover the entire transfer to the payroll account.[38] These circumstances lend credibility to the government's "last in–first out" approach to the tracing of funds through the general account and permit the reasonable inference that INI funds were the source for all five of these same–day payroll deposits.

Having accepted the government's tracing methodology in theory, the court finds

**33.** (a) On September 29, 1969, the general account reflected a negative balance of $5,954.59. That same day, an INI loan of $10,000 was deposited to the general account, and a transfer of $23,436.48 was made from the general to the payroll account.

(b) On October 27, 1969, the general account reflected a negative balance of $1,597.29. On October 28, 1969, an INI loan of $40,000 was deposited to the general account, and a transfer of $23,805.03 was made from the general to the payroll account.

(c) On November 11, 1969, the general account reflected a negative balance of $1,718.32. That same day, INI loans totaling $40,000 were deposited in the general account and transfers totaling $24,000 were made from the general to the payroll account.

(d) On November 21, 1969, the general account reflected a negative balance of $5,032.31. On November 25, 1969, an INI loan of $22,000 was deposited to the general account, and a transfer of $15,000 was made from the general to the payroll account. See Government's Ex. # 1.

**34.** This deposit was made directly to the payroll account on December 19, 1969. See Government's Ex. # 1.

**35.** (a) On August 11, 1969, an INI loan of $35,000 was deposited to the payroll account and

transfers totaling $15,000 were made from the general to the payroll account.

(b) On August 25, 1969, an INI loan of $30,000 was made to the general account, and a transfer of $19,904.63 was made from the general to the payroll account.

(c) On August 29, 1969, an INI loan of $35,000 was deposited to the general account, and a transfer of $21,322.44 was made from the general to the payroll account.

(d) On September 5, 1969, an INI loan of $21,000 was deposited to the general account, and a transfer of $21,440.62 was made from the general to the payroll account.

(e) On September 15, 1969, an INI loan of $25,000 was deposited to the general account, and a transfer of $10,000 was made from the general to the payroll account. See Government's Ex. # 1.

**36.** Schlesinger Dep. # 2, p. 40.

**37.** Schlesinger Dep. # 2, pp. 14–15, 40.

**37A.** Schlesinger Dep. # 2, p. 40.

**38.** The court refers here to the payroll deposits of August 11 and 29, and September 5, and 15, 1969. See Government's Ex. # 1.

that the government has not entirely met its burden of proof as to two other payroll deposits totaling $28,461.01.[39] In these instances, INI funds were not the last funds deposited to the general account prior to the transfers to payroll. Instead, there were intervening deposits to the general account from other sources. Accordingly, the total amount of these payroll deposits attributable to INI loans must be decreased to $5,676.29.

Prebuilt's records also indicate that a loan of $58,182.33 was received from INI on January 1, 1970. An adjusting entry to Prebuilt's accounts on January 31, 1970 indicates that these funds, along with funds totalling $54,146.13 from other sources were applied to decrease accrued payroll by $76,159.05 and to increase Prebuilt's cash account by $36,169.41.[40] The court finds that all $58,982.33 of this INI loan is attributable to payroll.[41]

The court further finds that a deposit of $11,505.06 to the payroll account on October 13, 1969 is attributable to INI, since the funds originally were part of a loan of $350,000 from the City National Bank which INI negotiated on Prebuilt's behalf and for which INI deposited collateral in excess of the loaned amount.[41A] Though these loaned funds are not directly traceable to INI, INI's participation in securing the loan and its over—collateralization of the loan are sufficient to render INI the lender of these funds for purposes of § 3505(b).[42]

 INI raises several other objections to the government's proofs which may be quickly disposed of. INI contends that it cannot be held liable on any payroll funds loaned during August, 1969, since there were sufficient funds in Prebuilt's payroll account throughout the month to cover both payroll and payroll taxes. This argument is without merit. It appears from the record that shortly after August 9, 1969, INI directed Prebuilt to stop paying withholding taxes regardless of the balance in the payroll account.

 INI also contends that it cannot be held liable on any payroll funds loaned after November 18, 1969, since Prebuilt's payroll account became overdrawn on that date and reflected a negative balance at all times thereafter. On this basis, INI argues that any funds loaned to Prebuilt and deposited in Prebuilt's payroll account subsequent to November 18, 1969 were loaned for the purpose of covering bank overdrafts, not for the purpose of paying wages. This argument is also rejected. Subsequent to November 18, 1969, INI funds continued to be requested and received for deposit in Prebuilt's payroll account, and payroll funds continued to be paid out of the account. For all practical purposes, this was a continuation of the same financing

---

**39.** (a) On November 14, 1969, the general account reflected a negative balance of $4,798.92. On November 17, 1969, INI loans totaling $30,000 were deposited to the general account. On November 18, 1969, deposits from other sources totaling $7,784.72 were made to the general account. On November 20, 1969, a transfer of $13,461.01 was made from the general to the payroll account.
(b) On December 10, 1969, the general account reflected a negative balance of $42.60. On December 12, 1969, an INI loan of $15,000 was deposited to the general account. On December 15, 1969, a deposit of $30,000 from another source was made to the general account, and that same day, a transfer of $22,000 was made from the general to the payroll account. See Government's Ex. # 1.

**40.** See Government's Ex. # 8.

**41.** See Government's Exs. # 45, 47–50.

**41A.** Schlesinger Dep. # 2, pp. 21 -23.

**42.** Judge DeMascio, in a prior Memorandum and Order dated March 29, 1976, ruled that the government's original complaint was subject to dismissal to the extent that it alleged liability of INI merely for guarantees of loans from third–party creditors. The government subsequently filed a more detailed amended complaint in which it specifically alleged INI's liability for guaranteeing this $350,000 City National Bank loan in light of INI's efforts in negotiating and over–collateralizing the loan. Because these factors are deemed crucial to the court's finding today and because they had not been pleaded at the time of Judge DeMascio's decision, the court rules that Judge DeMascio's Memorandum and Order of March 29, 1976 is not controlling on this point.

arrangements that INI and Prebuilt had operated under previously. The funds involved continued to be funds loaned by INI "for the specific purpose of paying wages," within the meaning of § 3505(b). The overdrawn status of the payroll account subsequent to November 18, 1969 does not operate to shift the lending responsibility under § 3505(b) from INI to the City National Bank.

INI raises a number of other arguments with regard to its liability and the extent of its liability under § 3505(b). None of them are substantial enough to merit discussion.

Accordingly, the court holds that INI is liable under § 3505(b) of the Internal Revenue Code for 25% of $250,395.78, or $62,-598.94, the amount determined by the court to have been advanced by INI to Prebuilt from August, 1969 to January, 1970 for the payment of wages, for which INI knew that no withholding taxes would be collected or paid.