**Frederick O. FITZGERALD, Jr., Plaintiff,**

v.

**UNITED STATES OF AMERICA, Defendant.**

**Civil Action No. 74–90.**

United States District Court, E. D. Kentucky.

Jan. 12, 1976.

Charles R. Hembree, Philip E. Wilson, Lexington, Ky., for plaintiff.

James F. Cook, Asst. U. S. Atty., Lexington, Ky., F. Gerald Burnett, Trial Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant.

WELLFORD, District Judge, sitting by designation:

## Order

This cause was heard by agreement of the parties by the Court without a Jury. This controversy involved the asserted individual liability of Frederick O. Fitz-Gerald, Jr., as a responsible officer to pay unpaid withholding and F.I.C.A. taxes of the following corporations, for the following periods and in the following amounts:

| Corporation: | Calendar Periods Involved: | Amount of Assessment: |
|---|---|---|
| International Business Associates, Inc. | 4th Quarter—1970 | $ 5,946.11 |
| Wimpy International, Inc. | 3rd & 4th Quarters—1970 | 1,697.12 |
| Wimpy of Syossett, Inc. | 3rd & 4th Quarters—1970 | 1,594.80 |
| Wimpy of Huntington, Inc. | 3rd & 4th Quarters—1970 | 2,583.82 |
| | Assessments under Section 6672 | $11,821.25 |
| | Assessment of Lien Fee on October 23, 1973 | 1.00 |
| | Total Assessments | $11,822.25 |

Partial payments have been made by Frederick O. FitzGerald, Jr. on the assessments made against him under Section 6672 of the Internal Revenue Code of 1954.[1] For purposes of trial, those partial payments approximated $1,890.00. Defendant has counterclaimed for the outstanding unpaid balance of the assessments.

FitzGerald admits that as President of the various corporations, he was a responsible person within the meaning of the law for said corporations during the above-mentioned periods, but he contends that he did not willfully fail to collect or truthfully account for and pay over said taxes. FitzGerald first became associated with said corporations in the late spring or early summer of 1969 when he was elected President and a Director of Wimpy International, Inc., ("Wimpy International"), Wimpy of Syosset, Inc. ("Syosset"), and Wimpy of Huntington, Inc. ("Huntington"). At that time, Syosset operated a fast food restaurant in Syosset, New York; Huntington operated a fast food restaurant in Huntington, New York; and Wimpy International was a holding company that owned all the issued and out-

---

1. "Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. No penalty shall be imposed under section 6653 for any offense to which this section is applicable."

standing stock of both Syossett and Huntington.

Wimpy is the trade name of a hamburger chain in Europe, and Wimpy International had purchased the right to use and promote the Wimpy name in the United States, exclusive of the Chicago, Illinois, area. It was the business purpose and goal of Wimpy International to develop a nationwide franchising business built around the Wimpy name.

The Board of Directors of Wimpy International included Edward Gold, who was interested in developing a chain of Wimpy Restaurants in the Chicago area; Eli Jacobs, a principal in the firm of White, Weld & Company of New York, a substantial stockholder in Wimpy International; and FitzGerald, who had a background in the fast foods business. At the time FitzGerald became President and a Director of Wimpy International, Syosset, and Huntington, the Board of Directors were negotiating with White, Weld & Company for a substantial private placement of stock of Wimpy International to be issued for necessary capital.

In June of 1970, Wimpy International and Johnnies American Inns (hereinafter "JAI") in Omaha, Nebraska, combined their operations and created a third corporation, International Business Associates, Inc. (hereinafter "IBA") to serve as a holding company. The shareholders of Wimpy International and JAI exchanged their respective shareholdings in return for proportionate stock interests in IBA. It was hoped that this merger, engineered in part by FitzGerald, would assist Wimpy International in its financial problems, since no capital had been generated through other directors' activities, including the White, Weld & Co. negotiations.

FitzGerald was employed to reorganize the staff of Wimpy International into an operating company capable of handling the proposed franchise business, and as part of the reorganization, he was instructed to and did cause the principal office of Wimpy International to be moved from New York to California.

Shortly before moving, he employed Robert F. Parsley ("Parsley") as comptroller of each of the corporations. Parsley later became Financial Vice President of the corporations, as well as comptroller. He had general responsibility for the financial affairs of the corporations, along with the responsibility of planning and establishing the financial and accounting system to be used in the franchise operations. Within the corporate structure, Parsley and his assistant had the primary responsibility for the preparation of tax returns and the payment of taxes (including withholding and F.I.C.A.) and other expenses due by each of the corporations. Carl Kantor was Secretary of each of the corporations here involved and Gerald Sawall was Treasurer of both IBA and JAI. Kantor and Sawall, among others, were also directors of IBA and Wimpy International.

In January, 1970, Parsley employed Mrs. Brigitte Burger ("Burger") as a bookkeeper for each of the corporations. Burger worked directly under Parsley and apparently prepared most of the corporate tax returns and prepared most of the corporate checks, including payroll checks, under Parsley's supervision.

Plaintiff, FitzGerald, as chief executive officer, was employed at an initial salary of $40,000 per year, but that salary was later increased to $60,000 per annum when IBA was formed. He and Parsley were principal signatories on each of the corporate bank accounts involved in this case (except JAI). All checks drawn on the corporate general accounts of Wimpy International, Syosset, Huntington and IBA required the signature of any two of the officers FitzGerald, Parsley and Sawall, but only one of them was required on payroll accounts.

When the date arrived for the Forms 941 for IBA, Syosset, Wimpy International and Huntington to be filed for the third quarter of 1970, and to pay over the withheld income and F.I.C.A. taxes due for that period, the corporations were in substantial need of additional

funds if they were to continue in business. On October 14, 1970, FitzGerald had reported at a meeting of the Board of Directors of IBA and its subsidiaries (Wimpy International and JAI) that the funds of IBA were "negligible," and that in order to continue, IBA would have to draw on monies received by JAI from operations. At the October 14, 1970, board meeting, however, FitzGerald also had expectations that additional units could be opened during the next 90 to 120 days, depending upon favorable outside financing.[2]

Funds in the various bank accounts of the corporations were frequently transferred to other corporate bank accounts. The corporations were, more or less, treated as a single entity with respect to obtaining and using funds where most needed.

When the Forms 941, "Employer's Quarterly Tax Returns", were due to be filed for the third quarter of 1970, together with the payment to the Government for the withholding taxes attributable to the last month of the third quarter of 1970, according to Parsley's testimony, FitzGerald told him not to pay over the taxes as the corporations needed the monies to continue the payments of the wages of the employees. This was corroborated by Burger, but flatly denied by FitzGerald.

At a Directors meeting of IBA in early November of 1970, after the due date for payment of third quarter taxes, it was learned that White, Weld & Co. was not going to be of assistance in arranging for capital through a private offering. Money received from Syosset and Huntington were insufficient for profitable operations, and neither Wimpy International nor IBA could rely on them as a source of revenue. At the time payment was due of the withholding taxes for the last month of the third quarter of 1970, nevertheless, sufficient funds were on hand from various corporate bank accounts to satisfy the withholding tax obligations then owing to the Government.

FitzGerald, in any event, learned at the November, 1970, IBA Board meeting that third quarter payroll taxes had not been paid. Parsley was directed to pay these taxes. At this time, FitzGerald advised that he would be terminating his employment, but would retain responsibility to close out the operations of Wimpy International, IBA, Syosset and Huntington. The New York operations were closed out during November and December, 1970. The Los Angeles offices of IBA and Wimpy International were closed at or about the end of the year when all their proper documents and the remaining assets of Syosset and Huntington were placed in storage with a Los Angeles storage company. Upon the closing of the Los Angeles offices of IBA, Wimpy International, Syosset and Huntington, FitzGerald, Parsley and Burger terminated their employment with said corporations. The Nebraska headquartered operations of JAI, however, continued after 1970.

At all pertinent times plaintiff and other officers were fully aware of the requirements to withhold taxes from the wages of employees and to pay those withholdings over to the Government of each corporation involved. During the periods in issue, there were discussions between plaintiff and other employees of the corporation, particularly Parsley, as to which creditors should or should not be paid.

During the fourth quarter of 1970, taxes were withheld from the wages of the employees of the corporations. The withholdings for the employees' income and F.I.C.A. taxes for the fourth quarter of 1970 were evidently not placed in a separate bank account or otherwise segregated from other funds of the corporations.

Plaintiff was aware and had knowledge during the fourth quarter of 1970 that the corporations were in an extremely precarious financial condition and that the withholding taxes were not being paid over to the Government.

2. Payment for the 3rd quarter of 1970 was due on October 30, 1970, according to Secs. 31.-6071(a)(1) and 31.6151–1(a) of the Regulations.

**1136**

This Court has jurisdiction over plaintiff's complaint under 28 U.S.C. § 1346(a)(1) and over defendant's counterclaim under 28 U.S.C. § 1346(c).

■ The burden of proof in this case, both as to plaintiff's claim and the Government's counterclaim, was upon plaintiff, requiring plaintiff to show that the Commissioner's determination was erroneous. *Liddon v. United States,* 448 F.2d 509 [28 AFTR 2d 71–5454] (C.A.5, 1971), cert. denied, 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed.2d 117 (1972); *Psaty v. United States,* 442 F.2d 1154 [27 AFTR 2d 71–1184] (C.A.3, 1971); *Braden v. United States,* 442 F.2d 342 [27 AFTR 2d 71–1411] (C.A.6, 1971).

■■ Plaintiff, FitzGerald, was a responsible person required to collect, truthfully account for, and pay over the taxes withheld from the wages of the employees of IBA, Wimpy International, Huntington and Syosset, as plaintiff possessed significant control over the administrative and financial aspects of the corporations. *Garnett v. United States,* 385 F.Supp. 665 [34 AFTR 2d 6060, 6062] (E.D.Ky., 1974); *Sorenson v. United States,* 521 F.2d 325 [36 AFTR 2d 75–5659] (C.A.9, 1975). The failure of plaintiff to account for and pay over the withheld (and F.I.C.A.) taxes was willful within the meaning of Sec. 6672 of the Internal Revenue Code of 1954. Plaintiff was aware that the withheld taxes were owing to the Government at least by the end of the third quarter of 1970 at a time when there were sufficient funds to discharge the withholding liability. Plaintiff thereafter knowingly permitted and allowed other creditors of the corporations, including himself as a highly paid employee, to be paid while the withholding taxes were owing to the Government. *Monday v. United States,* 421 F.2d 1210 [25 AFTR 2d 70–548] (C.A.7, 1970), cert. denied, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970). See also *Braden v. United States,* supra, and *Sorenson v. United States,* supra, at 328.

Section 7501 of the Internal Revenue Code imposes a trust on employee withholding taxes which attaches at the moment the taxes are withheld and terminates when the taxes are paid over to the Government. *Monday v. United States,* supra. As the withheld taxes were not set apart from the other funds of the corporations, plaintiff, as a responsible officer, assumed the risk that the funds would not be properly applied. *Bernardi v. United States,* [33 AFTR 2d 74–523] 74–1 U.S.T.C., par. 9170 (N. D.Ill.1973), opinion adopted, 507 F.2d 682 [35 AFTR 2d 75–452] (C.A.7, 1974).

Plaintiff was aware that taxes were owing to the Government during the fourth quarter of 1970 and continued to permit other creditors of the corporations to be paid. That factor, together with plaintiff's conduct in allowing other creditors to be paid without insisting on the maintenance of sufficient funds to pay the taxes that had been withheld from the wages of the employees of the corporations amounted to a willful failure to pay over to the Government the withholding taxes deducted from the wages of the employees during the fourth quarter of 1970. Each time salaries and other items were paid during the fourth quarter of 1970, such payments constituted a preference.

■ Plaintiff testified that he had relied on Mr. Parsley in the past to pay over the taxes. When knowledge was received, however, that the taxes had not been paid, plaintiff was no longer entitled to continue such reliance. *United States v. Leuschner,* 336 F.2d 246 [14 AFTR 2d 5599] (C.A.9, 1964); *Dougherty v. United States,* 327 F.Supp. 202, 205 [27 AFTR 2d 71–1478] (D.S.D., 1971), aff'd, without opinion, [sub nom. *Brown v. U. S.,*] 471 F.2d 656 (C.A.8, 1972). At that time, plaintiff had an affirmative duty to investigate or to correct mismanagement of the withholding taxes. The failure of plaintiff to rectify or to take meaningful action to rectify the delinquent withholding tax payments constitutes willfulness. *Kalb v. United States,* 505 F.2d 506, 511 [34 AFTR 2d 74–6104] (C.A.2, 1974). This willfulness extends not only to the withholding taxes delinquent as of the date even plaintiff ad-

mits he learned of the non-payment, but also as to taxes withheld during the remainder of the fourth quarter of 1970.

Plaintiff is liable, as a responsible officer, for the payment of all withholding and F.I.C.A. taxes due for the fourth quarter of 1970 of all four corporations involved, plus interest. The fact that Parsley may also be responsible for the tax liability asserted against FitzGerald does not relieve the latter of this liability.

Let judgment be accordingly entered for the United States and the amount thereof be computed in accordance with the method and procedure set out in the Stipulation dated December 3, 1975.