Jerrold B. SHERMAN, Plaintiff,

v.

UNITED STATES of America, Defendant and Third-Party Plaintiff,

v.

Burnell YAKSTIS, Third-Party Defendant.

Civ. No. 78–70567.

United States District Court,
E. D. Michigan, S. D.

Jan. 30, 1980.

Stephen M. Landau, Landau, Hoffert, Shatzman & Litt, Southfield, Mich., for plaintiff.

M. Carr Ferguson, Asst. Atty. Gen., Claire Fallon, Jay Nathanson, Trial Attys., Tax Div., Dept. of Justice, Washington, D. C., for defendant and third-party plaintiff.

MEMORANDUM OPINION GRANTING JUDGMENT IN FAVOR OF DE-FENDANT AND THIRD–PARTY PLAINTIFF, UNITED STATES OF AMERICA

PATRICIA J. BOYLE, District Judge.

The issue before the Court is whether Plaintiff Jerrold B. Sherman and third-party Defendant Burnell C. Yakstis are each personally liable under Sections 6671 and 6672 of the Internal Revenue Code of 1954 (26 U.S.C.) (the "Code") for the failure of Mobile of Marysville, Inc. to pay over to the United States the amount of $8,539.42 in withheld federal income and social security taxes. Pursuant to Rule 52, F.R.Civ.P. the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. On March 13, 1978 Plaintiff Jerrold B. Sherman filed a complaint for refund of Internal Revenue Taxes against Defendant and third-party Plaintiff, United States of America.

2. The Government thereafter responded and asserted a counter claim for 100% penalty against Plaintiff and thereafter filed a third-party complaint against Burnell Yakstis.

3. The Court has jurisdiction of the various claims pursuant to 28 U.S.C. §§ 1340, 1346(a)(1) and 1345.

4. Mobile of Marysville, Inc. was incorporated in the State of Michigan in August, 1973.. It was located in Marysville, Michigan and engaged in the manufacture and sale of mobile homes.

5. The formation of Mobile of Marysville, Inc. took place pursuant to a Plan of Arrangement of another Michigan Corporation known as Huron Industries, Inc. which had operated essentially the same business for several years prior thereto.

6. As part of the Plan of Arrangement the creditors of Huron Industries, Inc. exchanged their debt for preferred stock in Mobile of Marysville, Inc. and became entitled to representation on the Board of Directors.

7. Jerrold B. Sherman is and was an attorney licensed to practice law in the State of Michigan and acted as attorney for Huron Industries, Inc. while it was in arrangement.

8. Upon the incorporation of Mobile of Marysville, Inc. he exchanged the amount owed him by Huron Industries, Inc. for attorney's fees for 21,625 shares of preferred stock in Mobile of Marysville, Inc. In addition he made a capital contribution of $20,000 to Mobile of Marysville, Inc.

thereby acquiring 50% of the common voting stock.

9. Two former employees of Huron Industries, Inc., Burnell C. Yakstis and Clinton J. Jarvis, subscribed equally to the remaining 50% of the common stock for $10,-000 each. Jarvis made an immediate capital contribution of $3,000, leaving $7,000 owing; shortly thereafter Yakstis contributed $1,600 toward a payroll which was applied to his stock subscription leaving an outstanding balance of $8,400.

10. Sherman was President of Mobile of Marysville, Inc., Yakstis was Treasurer and Jarvis was Assistant Secretary and Vice President. All were members of the Board of Directors.

11. Yakstis acted as purchasing agent for the company; Jarvis was general manager and in charge of payroll. Jarvis was also assessed for willful failure to pay over the withheld federal income and social security taxes of the company but could not be located and therefore was not made a party in this action. Daniel Webb was sales manager. They worked daily on the premises of the company.

12. Sherman had a law practice in Detroit but visited the company's premises weekly and had telephone conversations about the company's business affairs with Yakstis, with the company accountants (Nair and Gomez), and with Charles Loznak (a principal in the company's major supplier and preferred stockholder, Eugene Welding, Inc.) as well as with other creditors, suppliers and financial institutions. He thereby involved himself in various phases of the business when needed, such as collecting accounts receivable, negotiating financing, arranging for additional supplies, and effectuating a design change in the manufacture of the mobile homes.

13. For their services, Yakstis and Jarvis each received a salary of $250 per week while Sherman received $500.

14. The company's premises, including offices and manufacturing plant, were leased from Shermak, Inc., a corporation owned equally by Sherman and Charles Loznak which had purchased the building.

15. The company maintained three checking accounts at the Peoples Savings Bank of Port Huron: a payroll account; a general account; and a tax account. Sherman, Yakstis and Jarvis were authorized to sign checks on all three accounts. However, the general account required two signatures.

16. Sherman had negotiated two types of financing with the Bank: floor plan financing by which the Bank loaned the company 80% of the sales price of each completed unit until it was sold; and accounts receivable secured financing in the approximate amount of $90,000. Sherman, Yakstis, Jarvis and their wives all signed personal guarantees for the accounts receivable financing.

17. During the period in issue from January 1, 1964 to April or early May, 1964, Yakstis was Treasurer and purchasing agent for the company. He was authorized to sign all checks and responsible for making day to day decisions about paying suppliers. He was familiar with the company's accounting system and was aware of the corporate obligation to withhold taxes and to pay over those taxes to the United States. By virtue of his position, he was a person having significant control over the company's finances.

18. During the period in issue Sherman was President and attorney for the company. By virtue of his 50% common stock interest and his influence over Eugene Welding, the company's major supplier, he held the position of control in the company. He was authorized to sign all checks; set up the company's procedures for the payment of wages and bills; negotiated financing; loaned $5,000 to the company on February 27, 1979; attended a mobile home show in January, 1964 to contact and negotiate credit with suppliers; rejected Yakstis' suggestion to temporarily close the company because of lack of capital; engaged in attempts to sell the company through one of the preferred stockholder members of the Board of Directors; assisted Yakstis in arranging for supplies when Yakstis' at-

tempts failed; and was contacted by creditors seeking payment of their overdue bills. All of these actions demonstrate that Sherman exercised significant control over the company's finances.

19. The company encountered severe cash flow problems from the time it opened its doors. Both Sherman and Yakstis were aware of this.

20. Although the company paid over the federal income and social security taxes withheld from the wages of its employees during the period from August, 1963 to December 31, 1963, it did not pay over the $7,311.23 withheld during the period from January 1, 1964 to March 31, 1964 nor the $1,228.19 withheld during the period from April 1, 1964 until it ceased business in April or early May, 1964.

21. During the period in issue, the company had sufficient funds to pay the taxes withheld if it had chosen to do so.

22. Under the accounting system set up by Sherman for the company, all receipts were to be deposited in the general account which was to be used to pay all bills except payroll and payroll taxes. When a payroll was to be made, a check for gross payroll was to be written from the general account to the payroll account. Then a check was to be written on the payroll account for payroll taxes for deposit in the tax account. The payroll checks were then to be written as payment of employees wages.

23. Sherman did not set up a system for the payment of withheld taxes from the tax account over to the United States.

24. In early 1964, the cash flow problem became so severe that the company was only able to manufacture sold mobile homes and there was barely enough money to buy supplies and for net payroll.

25. The bank statements for the tax account indicate that the last deposit occurred on January 10, 1964. (Deft. Ex. E.)

26. Yakstis admitted that he was aware when the company became unable to pay gross payroll and still remained in operation. He further testified that he discussed this fact with Sherman and that on occasion it was necessary for the company to hold up delivery of his, Jarvis' and Sherman's payroll checks in order to meet net payroll.

27. Sherman's testimony is conflicting in that he states that Yakstis displayed accounts payable records for the months ended January 31, 1964 and February 28, 1964 (Deft. Exs. U and V) to him and other members of the Board of Directors as proof that the payroll taxes were being paid and that Sherman believed him. Yet, Sherman also testified that he thought the taxes were due at the end of the quarter in which case they would either not have appeared as payable until March 31st at the earliest or should have shown as payable for each month until paid.

28. Yakstis denies informing Sherman or anyone else that the taxes were paid. On the contrary he states that he informed Sherman that there was barely enough to pay net payrolls never mind gross payrolls and points out that the accounts payable records which are Defts. Exs. U and V included only trade payables and would contain no information as to payroll taxes. The Court credits this testimony.

29. Sherman admittedly was aware of the company's severe cash shortages in 1964; his own payroll check was withheld on several occasions; he engaged in discussions with creditors, potential purchasers of the company and financial institutions of a type which necessitated knowledge of and representations concerning the financial status of the company. Moreover, he testified that he lacked confidence from the beginning that Yakstis would take care of paying the taxes based upon his past performance in Huron Industries. In view of these admissions, Yakstis' testimony is more believable than Sherman's on whether Sherman was aware that the payroll taxes were not deposited in the tax account after January 10, 1964.

30. Moreover, Yakstis admits that not only did the company fail to deposit the payroll taxes after January 10, 1964, but that on five occasions thereafter he signed checks on the tax account in order to pay creditors and wages.

31. The following checks were signed by Yakstis on the tax account during the period in issue:

| DATE | CHECK NO. | AMOUNT |
|------|-----------|--------|
| Jan. 13, 1964 | 105 | $1,000.00 |
| Jan. 31, 1964 | 107 | 300.00 |
| Feb. 14, 1964 | 110 | 838.90 |
| Feb. 14, 1964 | .112 | 700.00 |
| Mar. 6, 1964 | 113 | 400.00 |

32. Check Nos. 105 and 112 were written at the request of Sherman and with knowledge that the monies were being paid from the tax account. Check No. 105 was to reimburse Sherman for a $1,000 loan he had made to the company for expense of the mobile home show which the company's officers attended in January, 1964. Check No. 112 was written to fulfill a commitment which Sherman had made to pay a supplier Pre-Tone Plywood $1,000 on its account. The check amount of $700 was deposited into the general account which already contained approximately $300 and a general account check was written to pay Pre-Tone.

33. Despite his knowledge that the tax account had been depleted and that all other deposits had ceased, Sherman took no action to see the taxes were paid. In fact, on March 24, 1964, he agreed to deliver 6 post-dated checks of $1,000 each to Pre-Tone and one for $630.04 as payment on account and told Yakstis to prepare and sign the checks. In addition, he paid or permitted the payment of over $110,000 in the months of March and April alone, to creditors, including employees' wages, other than the United States.

34. Throughout the period in issue, Yakstis signed checks in payment of wages and creditors with full knowledge that no monies had been set aside for payroll taxes.

35. Finally, in an interview on April 29, 1965, Sherman signed a statement for submission to the Internal Revenue Service in which he stated that he became aware in March, 1964 that the company's tax liability was not paid. (Deft. Ex. F, Item 21).

36. Despite this knowledge after March, 1964, Sherman paid or permitted the payment of over $40,000 to persons other than the United States.

37. A delegate of the Secretary of the Treasury timely made assessments under Section 6672 against Yakstis and Sherman on January 14, 1966, and February 10, 1967, respectively, each in the amount of $8,539.42 for their willful failure to pay over the withheld taxes to the United States. Notice and demand for payment of the assessments was made on the respective assessment dates.

38. Subsequently, Yakstis paid $1,125.73 on the assessment against him and Sherman paid the following amounts:

Table of Payments and Credits

| Date | Amount |
|------|--------|
| July 29, 1968 | $ 126.66 |
| July 30, 1968 | 12.70 |
| August 8, 1975 | 100.00 |
| April 15, 1978 | 2,817.00 (credit) |
| | $3,056.36 |

39. On August 8, 1975, Sherman filed a claim for refund (Form 843) of the $100.00 paid by him on that date. The Internal Revenue Service denied the claim by certified letter dated March 2, 1977, and Plaintiff instituted this suit on March 13, 1978. The United States, in turn, timely counterclaimed against Sherman for $5,483.06, plus statutory interest and impleaded Yakstis as third-party defendant, claiming from him the outstanding balance of the amount of $7,413.69, plus statutory interest.

## CONCLUSIONS OF LAW

1. Section 3102(a) of the Internal Revenue Code of 1954 requires an employer to withhold social security taxes (F.I.C.A.) imposed on its employees and Section 3402(a) of the Code requires the withholding of income taxes from the wages of employees. The taxes which must be collected or withheld are to be held as a special trust fund for the United States pursuant to Section 7501 of the Code. An officer, or employee or other person in a corporation, who is under a duty to collect and pay over taxes withheld from the wages of employees and willfully fails to do so, is liable for the total amount of tax not paid over by reason of Section 6672 of the Code. Al-

though denominated a penalty, the liability imposed by Section 6672 is not penal, but is merely a means of ensuring that the taxes will be paid by shifting the responsibility for payment from the corporation to the persons responsible for the nonpayment. *Braden v. United States,* 318 F.Supp. 1189 (S.D.Ohio, 1970), aff'd. 442 F.2d 342 (C.A.6, 1971); *Botta v. Scanlon,* 314 F.2d 392 (C.A.2, 1963); *Spivak v. United States,* 370 F.2d 612 (C.A.2, 1967); *United States v. Graham,* 309 F.2d 210 (C.A.9, 1962).

2. It is clear that Congress intended Section 6672 to be applied and construed as a stringent measure for the protection of the withheld taxes at their source. *Mueller v. Nixon,* 470 F.2d 1348 (C.A.6, 1972).

3. In order for a person to be liable under Section 6672, two factors must exist: (a) He must have been a person required to collect or truthfully account for, or pay over the employment taxes; and (b) He must have willfully failed to pay over the trust funds. *Braden v. United States, supra.*

4. The burden of proof is on Sherman and Yakstis to prove that each was not such a responsible person and that his failure to pay over the taxes was not willful. *Psaty v. United States,* 442 F.2d 1154 (C.A.3, 1971); *Lesser v. United States,* 368 F.2d 306 (C.A.2, 1966); *Shepherd v. United States,* 38 A.F.T.R.2d 76–6103 (E.D.Mich., Oct. 29, 1976); *United States v. Stefansky,* 16 A.F.T.R.2d 5640 (E.D.Mich., 1965).

5. Liability under Section 6672 is not limited to a single person; accordingly both Sherman and Yakstis can be held liable for the taxes. *Braden v. United States, supra.*

6. On the issue of responsibility, it is well established that

> Corporate office does not, *per se,* impose the duty to collect, account for and pay over the withheld taxes. On the other hand, an officer may have such a duty even though he is not the disbursing officer. . . . Liability attaches to those with power and responsibility within the corporate structure for seeing that the taxes withheld from various sources are

> remitted to the Government. . . .
> This duty is generally found in high corporate officials charged with general control over corporate business affairs who participate in decisions concerning payments of creditors and disbursal of funds.

*Monday v. United States,* 421 F.2d 1210, 1214–15 (C.A.7, 1970).

7. Moreover, liability under Section 6672 is not limited to those persons who have ultimate fiscal control, but it encompasses those persons who have significant control. *Fitzgerald v. United States,* 407 F.Supp. 1132 (E.D.Ky.); *Garnett v. United States,* 385 F.Supp. 665 (E.D.Ky., September 27, 1974); *Turner v. United States,* 423 F.2d 448 (C.A.9, 1970). See *Sorenson v. United States,* 521 F.2d 325 (C.A.9, 1975).

8. Sherman and Yakstis, as President and Treasurer, respectively, were high corporate officers charged with the management and control of the company's business affairs and given the authority to sign checks on the corporate checking account.

9. Sherman directed the financial policy of the company, set up the accounting systems, negotiated its financing and made the decisions to keep the company operating for as long as possible so that it could be sold. He also participated in decisions concerning the payment of suppliers.

10. Yakstis directed the purchasing of the company and made day to day decisions concerning the payment of suppliers and other creditors and participated in making other decisions with Sherman.

11. It is clear that both Sherman and Yakstis were responsible persons having both the duty and the authority to see that creditors including the United States were paid. *Monday v. United States, supra.*

12. The Sixth Circuit has cited with approval a passage including the following discussion of "willfulness" which appeared in *Monday v. United States, supra* :

> The precise content to be given the concept of "willfulness" varies according to the legal context in which it appears. In criminal statutes, "willfulness" gener-

ally requires bad purpose or the absence of any justifiable excuse. *United States v. Murdock*, 290 U.S. 389, 394, 54 S.Ct. 223, 225, 78 L.Ed. 381. In civil actions, however, these elements need not be present. Rather, willful conduct denotes intentional, knowing and voluntary acts. It may also indicate a reckless disregard for obvious, or known risks.

*Braden v. United States, supra*, at 344. This Circuit also defines willful action under Section 6672 as referring to voluntary, conscious and intentional as opposed to accidental decisions not to remit funds properly withheld to the United States. Liability does not depend upon the presence of bad motive or the specific intent to defraud the Government or deprive it of revenue. *Braden v. United States, supra.*

13. Yakstis admits that during the period in issue he knew that the payroll taxes were due and owing and yet unpaid. He was aware that when payrolls were made only enough funds to cover net payrolls were transferred from the general account to the payroll account and that there were not enough other funds on hand to both pay the taxes and keep the company in operation.

14. Yakstis and Sherman discussed the fact that the company did not have sufficient funds to pay to the United States the taxes withheld from the employees' wages. Moreover, they cooperated in depleting the tax account of the funds which had already been set aside.

15. The bank statements of Mobile of Marysville, Inc. demonstrate that during the months of March and April alone, over $110,000 in corporate funds were paid for employees' wages or to creditors other than the United States at a time when Yakstis and Sherman knew the taxes were unpaid. This constitutes willfulness within the meaning of Section 6672, for it is knowledge of the tax delinquency and authority over the decisions to pay or not to pay the taxes which is determinative—not who has the duty of filling out the forms. *Mueller v. Nixon*, 470 F.2d 1348 (C.A.6, 1972).

16. Each time the net payroll was met, Sherman and Yakstis each consciously took the risk that the necessary funds would not be available on the prescribed date for payment. In effect, each breached his duty as trustee by using the trust funds for operating expenses, and the only way this willful breach would have been "excused" would have been by payment of the taxes on the due date. *Newsome v. United States*, 431 F.2d 742 (C.A.5, 1970).

17. All of the money available was used to keep the business going rather than to pay the taxes. Using the trust funds to pay the current expenses of the business constitutes wilfulness within the meaning of the statute. *Braden v. United States, supra*. As the Court stated in *United States v. Hill*, 368 F.2d 617, 621 (C.A.5, 1966), "The desire to continue in business is not justification for violating the trust imposed by law to pay taxes."

18. Jerrold B. Sherman and Burnell C. Yakstis were responsible officers of Mobile of Marysville, Inc. and wilfully failed to pay over to the United States the amount of $8,539.42 in federal income and social security taxes withheld from the wages of its employees during the quarterly periods ended March 31, 1964 and June 30, 1964.

19. In view of these findings the Court need not reach the issue as to whether Mr. Sherman's claim for refund was timely filed within the meaning of 26 U.S.C. § 6511.

## CONCLUSION

The United States shall prepare judgments setting forth that Plaintiff's complaint be dismissed with prejudice and that judgment be entered against Sherman and Yakstis for the amount owing to the United States, plus interest as provided by law and the costs of this action.